Robert M. CALVIN, Plaintiff,

v.

Margaret M. HECKLER, Secretary of Health and Human Services, Defendant.

Civ. A. No. 85-156 Erie.

United States District Court, W.D. Pennsylvania.

May 29, 1986.

Douglas W. Reed, Pittsburgh, Pa., for plaintiff.

Judith K. Giltenboth, Asst. U.S. Atty., Pittsburgh, Pa., for defendant.

## OPINION

GERALD J. WEBER, District Judge.

Plaintiff brings this appeal from an adverse decision on his application for disabil-

ity insurance benefits. 42 U.S.C. § 405(g). He has satisfied all the jurisdictional prerequisites for filing suit in the district court. Pursuant to our customary order, the parties have filed cross-motions for summary judgment which we now address.

Plaintiff is 54 years old. He has a fifth grade education, is functionally illiterate, and can only write his name. During his relevant period of employment, he worked as a welder and a welder's helper. He alleges that a concussion from an automobile accident in February 1982, severe headaches, and dizziness render him disabled from substantial gainful activity.

During the process of administrative appeal, plaintiff was heard before an administrative law judge. The hearing included testimony by a vocational expert favorable to plaintiff's claim. The ALJ rendered an opinion finding disability and granting benefits.

On its own motion, the Appeals Council reversed the ALJ, determining that his decision was not supported by substantial evidence. 20 C.F.R. Part 404.969–404.983. As partial support for this determination, the Appeals Council found that plaintiff's testimony regarding his symptoms was not fully credible. In addition, the Appeals Council rejected the testimony of the vocational expert. This action by the Appeals Council constitutes the Secretary's final decision.

We will reverse the Secretary for three reasons. First, the Appeals Council, like any reviewing body, must exercise great care in modifying a fact-finder's determination of credibility. The ALJ actually observed the claimant's demeanor, on which credibility findings largely hinge. The Appeals Council reviewed only Mr. Calvin's file. In so doing, the Council concluded that:

> Although the evidence is consistent with a finding that the claimant suffers from some dizziness and headache pain, and although some attacks may be more se-vere than others, the claimant's representations concerning the frequency and severity of is symptoms and their overall effect on his ability to engage in work activity are not borne out by the record as a whole. Neither the medical nor the lay observations in file describe frequent loss of balance or accidents associated with this condition.

Record at 9.

This scrutiny would seem to require an unfair burden of proof. To be sure, the claimant bears the burden of proving disability, and a claimant's statements alone cannot conclusively establish the existence of an impairment. *Torres v. Schweiker*, 682 F.2d 109 (3d Cir.1982), *cert. den.* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1020 (1983); 20 C.F.R. Part 404.1528 and 1529. But to require medical or lay observations of "frequent loss of balance or accidents associated with this condition" suggests that someone must monitor plaintiff throughout the day and report these events. Outside of observing plaintiff during an extended hospital stay, we do not know how medical personnel would be qualified to submit such evidence.[1] Furthermore, requiring such proof overlooks the possibility—as plaintiff testified here—that dizziness occurs only when he assumes certain positions. Record at 42. He can avoid these positions in the course of his presently restricted daily life, but may not have such control over his physical habits while regularly attending work. Plaintiff also testified that his dizziness also occurs in relatively unpredictable cycles. Record at 40–41. When he is not so afflicted, he may be capable of substantial gainful activity, but this determination must be balanced against the recurrence of episodic dizziness in assessing plaintiff's suitability for employment on the whole. We conclude that the Appeals Council has insufficient grounds for disturbing the ALJ's credibility determination as to plaintiff's complaints of dizziness, headaches, and re-

---

1. Of course, extended hospital stays are usually associated with serious illness accompanied by other medical findings, which makes the importance of observations of "frequent loss of balance or accidents" less decisive in establishing disability.

stricted activities. *Green v. Schweiker*, 749 F.2d 1066 (3d Cir.1984).

Second, the Appeals Council similarly challenges the testimony of the vocational expert.

[T]he testimony of the vocational specialist at the hearing was given in response to improper questioning by the administrative law judge. In essence, the questions posed to the vocational specialist ... were requests to comment on the claimant's residual functional capacity, the determination of which, at the hearing level, is the responsibility of the administrative law judge alone. Therefore, the testimony of the vocational specialist regarding the claimant's restrictions is not valid and the administrative law judge's uncorrected admission of such testimony was an error of law.

Record at 9.

Residual functional capacity is what you can still do despite your limitations. We consider your capacity for various functions as described in the following paragraphs.... Residual functional capacity is a medical assessment. However, it may include descriptions (even your own) of limitations that go beyond the symptoms that are important in the diagnosis and treatment of your medical condition. Observations of your work limitations in addition to those usually made during formal medical examinations may also be used. These descriptions and observations, when used, must be considered along with the rest of your medical record to enable us to decide to what extent your impairment keeps you from performing particular work activities....

(b) Physical abilities. When we assess your physical abilities (e.g., strength) we assess the severity of your impairment(s) and determine your residual functional capacity for work activity on a regular and continuing basis. We consider your ability to do physical activities such as walking, standing, lifting, carrying, pushing, pulling, reaching, handling and the evaluation of other physical functions.

A limited ability to do these things may reduce your ability to do work.

(c) Mental impairments. When we assess your impairment because of mental disorders, we consider factors such as your ability to understand, to carry out and remember instructions, and to respond appropriately to supervision, co-workers and work pressures in a work setting.

(d) Other impairments. Some medically determinable impairments, such as skin impairments, epilepsy, and impairments of vision, hearing or other senses, postural and manipulative limitations, and environmental restrictions do not limit physical exertion. If you have this type of impairment, in addition to one that affects physical exertion, we consider both in deciding your residual functional capacity.

20 C.F.R. Part 404.1545.

The testimony of the vocational expert at the administrative hearing consists of the following:

Q Mr. Edelman, would you please identify yourself for the record and tell us a little bit about your education, background and experience?

A My name is Samuel Edelman. I hold a Master's degree at the University of Pittsburgh in Rehabilitational Counseling. I'm formerly on the faculty of the University of Pittsburgh. In private practice since 1975, as a vocational rehabilitation counselor.

Q Have you listened to the testimony elicited here, today?

A I did.

Q You had the opportunity to review the documents, which I received into evidence in this case?

A Yes, I did.

Q Mr. Edelman, are you familiar with the various vocational source volumes and documents utilized by the Office of Hearings and Appeals in the unification of disability cases?

A Yes.

Q Are you also familiar with the 200 unskilled, sedentary and 1400 unskilled,

light jobs listed and described in the various volumes and documents?

A Yes, sir. I am.

Q In this case, Mr. Edelman, first, I want you to assume that I would base my decision on the testimony, alone. In other words, I'd find the testimony to be credible, and then reach a decision based on that. Now, with that possible finding I might make in this case, do you have an opinion as to whether or not there are jobs in the economy which the claimant could perform? And if your answer is yes, and you believe there are, would you be kind enough to give us some representative examples and tell us something about their incidence in the economy?

A Assuming the credibility of the testimony, in my opinion, the claimant could not do any type of work. The claimant's past work has all been heavy, laborer with different skill levels, the most being welder, which is skilled work. Others, getting down to semi-skilled, a welder's helper, and the other jobs, is unskilled work.

The claimant could not return to any of those past jobs. He's precluded from working around machinery. Claimant is a very poor candidate for retraining, due to not only the illiteracy issue and physical problems, but also to the memory and concentration problems. Because of that, it is my opinion that the claimant is incapable of learning a new skill over learning a new, even, unskilled job, due to this group of problems.

Q Now, Mr. Edelman, I want you to assume that I'm going to find this clause in this case of Exhibit Number 28, the— it shows of St. Vincent's Hospital, admission of February 23rd, 1982, after a INADUIBLE relaxant. Final diagnosis at that time was concussion, laceration of the left scalp and gross hemoturian (phonetic).

Exhibit 29, the report of neurological consultation, May 21st, 1982, by Doctor Menser (phonetic). Claimant complained of vertigenis (phonetic) sensations and sensitivity to loud noises and bright lights. Doctor Menser's impression was that was a normal neurological examination without endoscopic (phonetic) evidence of increased intra-cranial pressure. A CAT scan on July 2nd, '82, revealed no significant abnormality. Doctor Littman reported on August 27th, 1982, the claimant has benign, beroxinal (phonetic) positional vertigo, which was completely controlled at that time by Antivert. And a report of May 1st, of 1983, was at 1:30 Doctor Littman gave a diagnosis of a stable positional vertigo and headaches.

Exhibit 31, on November 19th, 1983, Doctor Talerica (phonetic) reported the claimant was treated for essential hypertension, which has been well controlled. The doctor noted that claimant's main problem may be psychological in nature. Physical exam was within normal limits.

Exhibit 19—Exhibit 32, a report of an examination of December 15th, 1982, by Richard Gracca, Ph.D. (phonetic), showed the claimant was complaining of headaches, reduced concentration. His diagnosis was non-psychotic organic brain syndrome from trauma.

Doctor Duncan's (phonetic) office note of February 7th, 1984, in Exhibit 33, indicated the claimant still has severe daily headaches, continual diseqilibrium and dizziness, which was not, at this time, controlled by Antivert, showing a progression or at least a lack of—of medicine being able to control them.

In a report of June 22nd, 1984, Doctor Littman gave his diagnosis of post-traumatic benign beroxinal positional vertigo—a report on June 22nd, 1984, Exhibit 34, Doctor Littman gave a diagnosis of post-traumatice benigh beroxinal posional vertigo with persistent symptoms. Stated that the claimant had severe INAUDIBLE vertigo, disequilibrium, and obvious sight disturbance. And there was no current therapy at that current— being June, '84.

Now, assuming that I would find the credibility of these reports, would that change your opinion in any way?

A   No, it would not.  I think it would substantiate the testimony given by the claimant.

ALJ:  Any questions of this witness?

ATTORNEY:  No questions.

ALJ:  The hearing in this case is closed.

Record at 53–57.

As shown, the ALJ asked the vocational expert two substantive questions: (1) Assuming credibility of the testimony, did jobs exist for a person of plaintiff's skills, and (2) assuming the ALJ found certain medical reports credible, would they change his opinion.  The expert straightforwardly replied no to both questions.  These questions and answers are consistent with those found in other cases involving the use of vocational experts.  We do not consider the expert's testimony to be a "medical assessment."  The expert briefly elaborated on his reasoning based on certain assumptions, but this does not constitute an evaluation of residual functional capacity.  In any event, the expert's testimony is not binding on the ALJ.  Even if an expert strays into the area of administrative discretion, the ALJ may balance this in determining the extent to which he finds the testimony reliable.  It does not follow that the expert's entire opinion therefore would be invalid.  We conclude that the expert's remarks were not improper and that the ALJ gave them due consideration without abdicating his role as a factfinder.

Third, we believe the ALJ's decision is supported by substantial evidence.  Plaintiff was examined by various specialists following his accident.  Doctor Francis Mainzer, a neurologist, believed that plaintiff suffered from benign positional vertigo, probably as a result of his head injury.  Dr. Mainzer prescribed Antivert for this condition.  Record at 170.  Dr. Joseph Talarico reported to the Pennsylvania Bureau of Disability Determination that, while Mr. Calvin's physical examination was normal, the February 1982 automobile accident altered his mental capacity.  Record at 172.  Dr. Richard Gacka, a psychologist, diagnosed plaintiff's illness as nonpsychotic or-

ganic brain syndrome.  "He would not appear capable of the sustained attention and concentration necessary for meaningful employment."  Record at 174.  Office notes from Doctor Michael Duncombe, a neurologist, from May 1983 to February 1984 revealed that plaintiff was suffering from "fairly severe daily headaches ... continual dysequilibrium plus episodes of dizziness when he changes positions....  He takes Antivert, but it does not really seem to make much difference.  He did not respond to the medicines that I gave him before."  Record at 176.  "He finds it difficult to do even simple activities" because of his headaches and dizziness.  Record at 177.  In June 1984 Dr. Sidney Lipman, who had treated plaintiff intermittently since August 1982, felt that plaintiff's vertigo was persistent and severe "with dysequilibrium and obvious gait disturbance."  Record at 179.

The ALJ ably reviewed these and other reports in evidence together with plaintiff's testimony and that of the vocational expert.  The Appeals Council's reversal of these findings is not supported by substantial evidence.  The record requires no further development; it contains substantial evidence that plaintiff is disabled and entitled to benefits.  *Podedworny v. Harris,* 745 F.2d 210 (3d Cir.1984).  We therefore will direct the award of benefits according to the terms set forth by the ALJ in his findings.

ORDER

Defendant's motion for summary judgment is denied.  Plaintiff's motion for summary judgment is granted and the Secretary's decision is reversed.  Plaintiff is entitled to disability insurance benefits in accordance with the findings of the Administrative Law Judge rendered November 16, 1984.